Robert J. McKennon (SBN 123176) *rm@mckennonlaw.com*
Nicholas A. West (SBN 309003) *nw@mckennonlaw.com*
**McKENNON LAW**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff, NANCIE GETTEL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| NANCIE GETTEL,<br><br>               Plaintiff,<br><br>vs.<br><br>STANDARD INSURANCE COMPANY; and DOES 1 to 10, inclusive<br><br>               Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>- Civil Cover Sheet;<br>- Summons; and<br>- Certification of Interested Parties] |

### INTRODUCTION

1.      Plaintiff Nancie Gettel, a first-grade teacher, has Chronic Inflammatory Response Syndrome ("CIRS") with mast cell activation, resulting in various severe symptoms.  She suffers from persistent and severe fatigue, as well as cognitive deficits such as pronounced memory loss, brain fog, confusion, trouble with word-finding, and difficulty learning new information.  She also experiences weight loss, gastrointestinal disturbances, numbness and tingling in her extremities, rashes, chest pain, throat swelling and closure, respiratory complaints, muscle spasms, blurred vision, dizziness, vertigo, night sweats, and marked mood changes including depression and anxiety.  Her clinical results further substantiate the diagnosis: she has tested positive for environmental hypersensitivity to certain molds, exhibits elevated mycotoxin levels, and shows the presence of biofilm-forming bacteria in sinus cultures.  Witness statements highlight the severity of her cognitive and mood impairment and document repeated episodes of anaphylaxis and physical collapse upon even minimal re-exposure to moldy environments.  Plaintiff only experiences slight improvement following extended absences from any setting with mold.  The onset and progression of her illness has closely paralleled her time in mold-contaminated environments while at work.

2.      These multifaceted, disabling symptoms have rendered Plaintiff unable to perform the essential functions of her teaching position.  Through her employment, she obtained long-term disability ("LTD") coverage under group policy number 501528 (the "Policy" ort "Plan") through Standard Insurance Company ("Defendant").  Even though Plaintiff clearly cannot work at this time, Defendant denied her claim for benefits.  It relied on the opinions of its peer review doctors and refused to accept the well-reasoned opinions of Plaintiff's treating physicians.  Defendant even refused to allow its consultant to consider compelling new medical information showing that Plaintiff suffered from the medical condition

Case No.:



that Defendant's consultant denied even existed.  Plaintiff now comes to the Court seeking the disability benefits she is entitled to under the Policy.

## JURISDICTION AND VENUE

3.    Plaintiff brings this action to recover benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

4.    Venue lies in the Central District of California, Eastern Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this District, some of the breaches alleged occurred in this District and the ERISA-governed plan at issue was administered in part in this District.

## THE PARTIES

5.    Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California and a resident of the City of San Bernardino, County of San Bernardino, California,.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by the California Teachers Association ("CTA"), which is at issue in this action.

6.    Defendant, at all relevant times, administered LTD benefits provided to Plan participants, including Plaintiff, by issuing the Policy to the CTA.  The Policy and the Plan promised to pay LTD benefits to Plaintiff should she become disabled.

7.    The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sue DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true



names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

## **FACTUAL BACKGROUND**

8.    Plaintiff was a first-grade schoolteacher at Belvedere Elementary.  She would spend her days preparing lesson plans, teaching students, and overseeing the safety and wellbeing of her students.  It was an occupation designated as "light" under the Dictionary of Occupational Titles.

9.    The Policy states in pertinent part:

You are Disabled if you meet the following definitions during the periods they apply:

A.   Usual Occupation Definition Of Disability

During the Benefit Waiting Period and the Usual Occupation Period you are required to be Totally Disabled from your Usual Occupation or Partially Disabled from your Usual Occupation.

1.   **Total Disability Definition**: You are Totally Disabled from your Usual Occupation if, as a result of Sickness or Injury, you are unable to perform with reasonable continuity the Substantial And Material Acts necessary to pursue your Usual Occupation and you are not working in your Usual Occupation.

. . .

**Usual Occupation** may be interpreted to mean the employment, business, trade or profession that involves the Substantial And Material Acts of the occupation you are regularly performing for your Employer when Disability begins.  Usual Occupation is not necessarily limited to the specific job you perform for your Employer.

**Substantial And Material Acts** means the important tasks, functions and operations generally required by employers from those engaged in

Case No.:



your Usual Occupation that cannot be reasonably omitted or modified.  In determining what Substantial And Material Acts are necessary to pursue your Usual Occupation, we will first look at the specific duties required by your job.  If you are unable to perform one or more of these duties with reasonable continuity, we will then determine whether those duties are customarily required of other individuals engaged in your Usual Occupation.  If any specific, material duties required of you by your job differ from the material duties customarily required of other individuals engaged in your Usual Occupation, then we will not consider those duties in determining what Substantial And Material Acts are necessary to pursue your Usual Occupation.

10.    Plaintiff originally worked at a different school.  As a result of the presence of mold in her work environment, she developed upper respiratory problems, including sinus infections and breathing issues.  The school's mold problems were remediated after Plaintiff left to work at Belvedere Elementary.

11.    Belvedere Elementary also experienced significant mold issues. The walls were damp and windows leaked, causing powder to crumble down the walls and accumulate on the floor. The plaintiff developed numerous severe health problems, such as severe stomach cramps, vomiting, blurred and reddened vision, serious breathing and hearing difficulties, fatigue, chest pain, migraines, and memory impairment.

12.    Although the work environment made Plaintiff ill, colleagues advised against reporting the issues, noting the school district would not address them and that reporting could lead to professional trouble.  Plaintiff continued to work and attempted to recover whenever she was away from the school.

13.    A temporary principal at Belvedere Elementary noticed Plaintiff's breathing issues and encouraged her to apply for Worker's Compensation benefits.

14.    On October 3, 2019, Plaintiff was examined by Leslie Cadet, M.D., but was instructed to return to work regardless of her condition.



15.    While she worked at Belvedere Elementary, Plaintiff continued to suffer from the same debilitating symptoms.  On or about October 7, 2019, her symptoms were so severe that an ambulance was called to take her to the hospital. Plaintiff's classroom also caused her students to become ill.  Plaintiff attempted to convince the school to remediate the problem, but nothing was remediated.

16.    Plaintiff's condition continued to worsen.  Daily, she would return home with symptoms such as: headaches, migraines, runny nose, sore throat, ear issues, blurry red eyes, rashes, brain fog, stomach cramps, nausea, and extreme fatigue.

17.    Plaintiff's condition was so severe that, at times, she would forget her colleagues' names and other basic information.

18.    On February 10, 2020, Plaintiff started treating with internist John Samples, M.D.  Dr. Samples agreed with Plaintiff that she could not work at that time.  However, the exact cause of her condition eluded her doctors.

19.    Plaintiff's condition improved when her school was closed during the COVID-19 pandemic.  However, her condition regressed when the school reopened and she was compelled to resume teaching in the same moldy environments.

20.    In Plaintiff's medical records dated January 9, 2023, Lee Lin, D.O., explained that "there's no specific test to evaluate for mold exposure to cause her neurological symptoms."  Plaintiff informed Dr. Lin that she had noticed symptoms for years.  She felt like she was improving during the COVID-19 pandemic because she was able to work from home.  However, when she would work in the older schools in California, Plaintiff would experience brain fog, memory problems, and have difficulty learning new things.  Dr. Lin was unable to help her.  Not only was he unable to assist Plaintiff, but he was even combative and dismissive of her condition.

21.    Plaintiff began treating with Joshua Farahnik, ND, MPH in May 2023. He diagnosed Plaintiff with Chronic Inflammatory Response Syndrome ("CIRS"),



also known as mold illness or biotoxin illness. It is a severe, multi-symptom inflammatory condition caused by prolonged exposure to biotoxins, most commonly those produced by certain molds in water-damaged buildings.  He also diagnosed Plaintiff with Mast Cell Activation Syndrome ("MCAS"), a condition where exposure to mold or its toxins (mycotoxins) acts as a trigger, causing a person's immune mast cells to become hyperactive and to inappropriately release excessive amounts of inflammatory chemicals, such as histamine.

22.    Plaintiff's medical records from a March 18, 2023 examination explained that her symptoms were worsening.  She suffered from weight loss, ear pain, postnasal drip, sore throat, posterior rhinorrhea, pharyngitis, otalgia, wheezing, dyspnea, coughing, shortness of breath, vomiting, nausea, abdominal pain, and headaches.

23.    In April 2023, Plaintiff paid to have her classroom tested for mold. Various forms of mold were detected.  However, medical examinations failed to establish that Plaintiff was sensitive to the mold detected.

24.    Plaintiff's May 31, 2023 medical records from a session with Dr. Farahnik noted that her fatigue was rated a nine out of 10.  Dr. Farahnik could see that Plaintiff was currently suffering from "shortness of breath or wheezing."  The records listed Plaintiff's main symptoms as:

> [B]rain fog, confusion, weight loss, GI issues (burns in esophagus seen on endoscopy and did biopsies), vertigo/dizziness, chest hurts/burns [when she is in the room her upper chest gets red], through swells/choking spells, thick phlegm (coming out of her throat – coughing up thick clear mucous every evening into morning after exposure to classrooms), extreme fatigue, numbness in toes and fingers off and on (at the tips, no tingling), muscle spasms, red eyes, blurry vision, ears hurt (on the inside – and muffled; and had blood coming out of her ear the other day), difficulty learning and retaining new information, trouble with finding words, night sweats, excessive thirst, increased urination, nausea, vomiting (off and on – mostly on Fridays), rashes (hands, arms, above buttox), mood issues (mood handled now through meds)



25.     Dr. Farahnik explained to Plaintiff that "I suspect you have mold associated Mast Cell Activation and possibly POTS (Postural tachycardia syndrome)."

26.     Plaintiff started taking naltrexone, an LDN immune modulator. However, Plaintiff suffered from adverse side effects from the medication and had to lower her dosage.

27.     Plaintiff attempted to return to work in July 2023.  If she did not return, she would have lost her medical insurance.  In a subsequent statement, Plaintiff described the next three days:

> I tried to push through for three days, but my body was reacting to my new classroom and in other areas of the school. I started having breathing issues and my throat kept closing. Even with the rescue inhaler, I could not stop coughing. I was pale, my blood pressure was elevated, my face had a rash all over it, my throat was sore, my ears hurt, l had headaches, my finger tips and toes went numb and I was struggling to stand to do my work. I began having more trouble finding words and following conversations. By the end of the third day back, the brain fog and confusion were getting worse. Each day after work, I collapsed and slept for a few hours. It was hard to get my work done.

28.     Plaintiff worked her last day on July 26, 2023.

29.     As Plaintiff sought treatment for her conditions, she continued to encounter difficulties working with some of the doctors in her medical network.  As a message from August 7, 2023 explains, "Pt states she also was seen with Psychiatry for Neuropsychological testing, but states MD was very dismissive. Please assist, thank you."

30.     In August 2023, Plaintiff was diagnosed with Multiple Antibiotic Resistant Coagulase Negative Staphylococci ("MARCoNS").  MARCoNS is an antibiotic resistant staph bacteria that resides deep in the nasal passage of some people.  Those suffering from chronic inflammatory illnesses are more likely to suffer from  MARCoNS.  It is found in many people with mold exposure.  It



1   ultimately results in increased fatigue and chronic pain.  It is often a symptom of

2   CIRS.

3          31.     Throughout his time treating Plaintiff, Dr. Samples has repeatedly

4   certified that Plaintiff could not return to work.  However, Kaiser Permanente, his

5   employer, has strict rules prohibiting its physicians from providing in depth

6   statements certifying that a patient is disabled.  They can only provide simplistic

7   form statements.  Dr. Samples consistently provided these statements in support of

8   Plaintiff's claim.

9          32.     Plaintiff's medical records from August 11, 2023 state "Indications . . .

10  MCAS."

11         33.     On September 25, 2023, Dr. Samples again certified that Plaintiff could

12  not work at that time.  He explained that it was due to uncontrolled symptoms of

13  MCAS.

14         34.     In a statement dated January 5, 2024, Dr. Farahnik explained that:

15

16  Nancie Gettel (DOB 1/12/73) is a patient under my care since May 31,
    2023. She has come to me with complaints of immense fatigue, brain

17  fog, confusion, cognitive impairments, weight loss, gastrointestinal
    complaints, dizziness/vertigo, chest pain, throat pain and swelling,

18  upper respiratory congestion, neuropathy, muscle spasms, red and
    irritated eyes, blurry vision, night sweats, rashes, and depressed and

19  anxious mood. These all started and worsened as a result of mold
    exposure in her classroom environment, which has caused her to have

20  Chronic Inflammatory Response Syndrome with mast cell activation.

21

22  Her laboratory tests continue to indicate elevations in mold toxins
    (mycotoxins) consistent with exposure to mold.

23
    One of the cornerstones of recovery from mold-related illness is to
24  eliminate the exposure, in this case, to fully remediate the mold in the
    classroom, or to relocate her to a classroom without mold. Medication
25  alone is not sufficient for recovery, although it can help mitigate some
    symptoms.
26
    **WORK STATUS RECOMMENDATIONS**
27

28



**Off Work:** This patient should placed off work until 1/31/2024 while she continues recovery.

**Other Needs and/or Restrictions:** Patient needs to be accommodated in a mold-free and non-water damaged building.

**Full Duty:** The patient will be deemed to return to work at full capacity after pending evaluation at yearend.

**Summary:** I recommend that Ms. Gettel either be given indefinite time-off of work so that she may recover fully from mold-illness, or to immediately relocate her to a safe classroom location that does not have mold. Without mold remediation or moving into a mold-free environment, Ms. Gettel's prognosis is continued ill-health as she has been experiencing these last years, with likely worsening.

35.    On or about February 21, 2024, Plaintiff submitted a claim for disability benefits under the Policy.  In an Employee Statement dated February 21, 2024, Plaintiff explained that she suffered from MCAS, breathing issues, memory problems, chest burning, brain fog, confusion, and her throat would randomly close off.

36.    Defendant provided Plaintiff's medical records to Saraleen Benouni, M.D. for a paper review report.  In a report dated May 22, 2024, Dr. Benouni rejected the position of Plaintiff and her treating physicians.  Dr. Benouni provided a simplistic statement that misstated that Plaintiff's testing for mold allergies was negative:

Mast cell activation syndrome - Not supported.

The information provided in the records reveals that the claimant is noted to have mast cell activation syndrome with reported symptoms of immense fatigue and brain fog with confusion and cognitive impairments in addition to weight loss, gastrointestinal complaints, dizziness, vertigo, and chest pain, in addition to throat pain, and swelling.

The claimant is noted to have had no diagnostic evaluation of tryptase, as well as laboratory evidence of abnormal eosinophilia and elevated IgE levels that would meet the criteria for mast cell activation syndrome or findings that are consistent with an alternative

Case No.:



immunologic etiology of her symptoms. Her testing for mold allergies was negative and her symptoms were thought to not be mold related[.]

37.     Dr. Farahnik responded to Dr. Benouni's position and disagreed with her conclusions, explaining that:

> Response: Ms. Gettel did have a serum tryptase ordered by Kaiser in August 2023 at a level of 8.3 mcg/L, and while normal I would still consider it elevated.  Tryptase levels are difficult to capture as abnormal unless the lab runs the test within hours after an acute reaction.  When Ms. Gettel began treatment with me she was in significant distress and attempting to capture a formal diagnosis of Mast Cell Activation Syndrome would require her to be off all treatments for some time and find specialty labs able to properly handle mast cell mediators.  As the priority has always been to help improve her quality of life, we did not waste time chasing down diagnostic labs but treated her according to symptom presentation which is consistent with a chronic inflammatory response to mold exposure.  While her IgE levels for the specific molds she was tested for were negative, she did have a considerably elevated reaction to intradermal mold testing.  Just because she did not react to any of the IgE mold species tested (and it is a limited list), does not mean there are no other species of mold that were missed (not tested for) and that she has reactivity to.  To assume these are the only species of mold possible is a limited perspective.

38.     Significantly, Dr. Benouni did not address Plaintiff's symptoms and misstated her testing results.  She simply concluded that Plaintiff did not suffer from one condition and therefore had no restrictions and limitations.  She focused on a single metric and refused to consider the other evidence before her.  This was highly improper.

39.     Dr. Benouni's entire analysis of Plaintiff's disabling condition is three sentences.  There is almost no other commentary in her entire report.  It is otherwise effectively a summary of Plaintiff's medical records.  Dr. Benouni's cursory report cherry-picks some facts while ignoring and misstating others.  This is improper under the law and establishes that Dr. Benouni's position is unreliable.  *See Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as

Case No.:



MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."); *Stuart v. CVS Corp.*, 2010 WL 890181, at *6 & n. 3 (E.D. Mich. Mar. 10, 2010) (finding administrator's decision denying benefits to be arbitrary and capricious where file review physician's report indicated that physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding"); *Black v. Hartford Life Ins. Co.*, 2019 WL 2422481, *7 (D. Oregon, June 10, 2019) (awarding benefits and finding insurer abused discretion because "Defendant has cherry-picked the evidence" by selectively picking "statements from the plaintiff's medical history that supported the decision to terminate her benefits, while ignoring evidence to support her disability").

40.    In a letter dated June 20, 2024, Defendant denied Plaintiff's claim for disability benefits.  It explained that:

> Our decision is based on a review of the medical documentation on file in combination of input from the Physician Consultant.  We find the Consultant's opinion to be well-reasoned and supported by the written available evidence.

> Based on the available information in your claim file, we find that you have a multitude of symptoms which you attribute to a toxic classroom.  However, your physical examinations have been unremarkable, and we do not find sufficient medical documentation to support you have a medical condition resulting in limitations and restrictions which would preclude you from performing your Usual Occupation.  Therefore, your claim is denied.

41.    Plaintiff's medical records from a treatment with Dr. Farahnik dated September 20, 2024 explained that "mold immunotherapy for allergy is successful but not for mold toxicity.  She has done it for other aeroallergens and I explained the cost/benefit analysis of doing the SPT for all but for now she wishes to simply focus on molds and does not believe she has any variation of symptoms when outside or as pollens change."

42.    Plaintiff's medical records from an October 21, 2024 visit with Dr. Samples explain that Plaintiff suffers from "cognitive disorder due to another



medical condition (primary encounter diagnosis) – prevent her from teaching. Worse when exposed to mold so patient will continue desensitization therapy to hopefully help." It was noted that Plaintiff had started mold desensitization therapy and custom allergy shots.

43.    In Plaintiff's February 13, 2025 medical records from an appointment with Dr. Samples, it was noted that Plaintiff suffers from "COGNITIVE DISORDER DUE TO ANOTHER MEDICAL CONDITION (primary encounter diagnosis) – documented by neuropsychological evaluation. Patient is thus unable to teach and cognition worsens post exposure to allergens/mold." Dr. Samples' medical records dated September 1, 2024 contained the same disability certification language.

44.    In a letter dated March 17, 2025, Plaintiff appealed the denial of her claim. Included with her appeal were statements from Dr. Farahnik, Dr. Samples, Plaintiff, her mother, and 33 pages of updated medical records. Plaintiff's personal statement recounted much of the information described above about her work conditions and symptoms.

45.    In his statement, Dr. Farahnik explained that:

Nancie Gettel (DOB 1/12/73) is a patient under my care since May 31, 2023. She has come to me with complaints of immense fatigue, brain fog, confusion, cognitive impairments, weight loss, gastrointestinal complaints, dizziness/vertigo, chest pain, throat pain and swelling, upper respiratory congestion, neuropathy, muscle spasms, red and irritated eyes, blurry vision, night sweats, rashes, and depressed and anxious mood. These all started and worsened as a result of mold exposure in her classroom environment, which has caused her to have Chronic Inflammatory Response Syndrome with mast cell activation.

One of the cornerstones of recovery from mold-related illness is to eliminate the exposure, in this case, to fully remediate the mold in the classroom, relocate her to a classroom without mold, or provide ample time-off work until such environments are remediated and deemed mold-free. Medication alone is not sufficient for recovery, although it can help mitigate some symptoms.



**WORK STATUS RECOMMENDATIONS**

**Off Work:** This patient should placed off work while she continues recovery, estimated recovery time is at least 6 months.

**Other Needs and/or Restrictions:** Patient needs to be accommodated in a mold-free and non-water damaged building.

**Full Duty:** The patient will be deemed to return to work at full capacity after quarterly evaluations and at which point she presents with sufficient recovery and confirmation of a classroom environment that is mold-free.

**Summary:** I recommend that Ms. Gettel continue with time-off so that she can recover fully from mold-illness.

46.     As for her statement, Linda Gettel, Plaintiff's mother, explained that:

I have been asked to provide a statement regarding my daughter's physical and mental changes that l have observed. For the record, my daughter is also my roommate, so I am a direct witness to her deterioration from her exposure to the toxic environment from her school. So, I watched an upbeat and excited teacher, struggle to continue to perform her assigned job duties as time went on. Her symptoms while she was working would improve only slightly over a weekend because of not being in the toxic rooms.

For the record, Nancie is the teacher that MANY students would come to see years after being a student in her classroom, so proud and glad about how she helped them with their multiplicity of their learning goals and/or problems. I witnessed this because I volunteered at times at school. I also witnessed this when we would see the students while out shopping. etc. They would see her and be so very excited. She was very well liked by all. She even inspired students who many times were deemed behavior problems with learning disabilities (mainstreamed students), to overcome their disabilities because she worked with them in ways to improve themselves dramatically. She and her students also won awards in science on many occasions, like first place for first grade at the science fair at her school and first place for San Bernardino school district. She continued to inspire her students in spite of her extreme physical reactions to the mold in her environment.

Teachers have to ensure the safety of their students. I have observed a dramatic change in her ability to focus and concentrate on all kinds of issues, which is counter to ensuring safety of students. I have watched her have neurocognitive changes also, such as increased anxiety,



Case No.:

depression, irritability, headaches, extreme mental and physical fatigue, memory loss, vertigo, and increased urination at night.

She went from being a very excited teacher (she loved going to school each day with all kinds of ideas for her children to do) to being very physically ill. She had shortness of breath which required the use of her rescue inhaler, breathing nebulizer, and medication, especially when her room had been rained on. She has multiple photos and documentation of the mold by the way. As time went on, while she was working, she was so ill she would spend her Saturdays in bed, too fatigued to do anything, while also trying to complete her teaching plans due on Sunday night to her principal.

She was very pale, continued to lose weight (almost 15 pounds), had extreme stomach pain and other GI issues, even with diet changes that were supposed to be supportive and healing. 1 also noted that during her summer breaks, etc., all of her symptoms would decrease, but eventually these symptoms were worsening and were too overwhelming. So, I watched a vivacious, inspiring teacher, try each and every day try to go to work. She tried her best to persevere through all of her overwhelming physical symptoms. Nancie became a physically ill person that continued to try each and every day to go to work.

She has always been the type to look for answers and to work hard for everything she does. These changes were shocking to watch as a parent. Her body has become super sensitive now and reacts when she goes into water damaged buildings that have mold damage. For example, at some medical clinics where water/ mold damages have been noted and staff have stated that it was there (the visual water staining, smell, mold color changes, etc.), she reacts vehemently. She has had anaphylaxis reactions to these areas and now carries an Epi-pen in order to save her life. Her personal Kaiser physician has directly observed her reactions as she has had anaphylactic reactions in his own office where there is still observable damage that still has not been fixed. These areas were reported to Kaiser membership services.

I am concerned about her ability to be able to work at this time as she cannot do many things that she used to be able to do as a teacher. I still she that she experiences many symptoms when exposed to mold. Her cognitive changes become worse like brain fog, poor memory, and anxiety, Her breathing becomes scary, because she immediately needs an inhaler, She becomes pale. The symptoms become lesser although not gone when she removes herself from that type of environment. She

Case No.:



has improved some but still contends with those symptoms. She still has weight loss, complains of stomach pain, headaches, and dizziness. She has notable fatigue that interferes with her daily activities, She also mood changes also when exposed to mold environmental toxins. I am hoping that she has more healing in the future so she can return to the lively person that she was.

47.    In her personal statement, Plaintiff explained her condition and her difficulties attempting to resolve the problems with her work environment.  She had struggled to resolve the problems, but nothing worked.  In her statement, she explained that:

I felt as if I had no choice but to continue to work. I wanted to teach and be with my students. I thought eventually the district would see that the room needed repair and would take care of things. I sent emails, photos, forwarded parent's letters about how sick their children were getting in the classroom, called AQMD, filed with CalOsha, contacted a School Board member, and nothing worked.

48.    She explained her attempts to treat her condition and how little helped:

Dr. Samples tried many different ways to help me. He started me in medications to help with breathing and allergies, but most did not work or the side effects were not tolerable. During this time, my throat would close several times a day. I had a rescue inhaler in my pocket and a breathing nebulizer in my classroom. I went home daily pale. with a headache or migraine, runny nose, sore throat, ear issues, blurry, red eyes, rashes, confused, brain fog, stomach cramps. Nausea, and extremely fatigued. Many days I came home vomiting, as well. I could not keep my weight up and lost over fifteen pounds. I would collapse daily as soon I as I got home and would have to nap for two to three hours after work. I ate dinner, did some work, and went back to bed. It was difficult for me to keep up with work. but I did the best that I could. I spent most of my weekends in bed with a migraine and feeling unwell. I barely could get out of bed on Sunday to complete lesson plans.

49.    She further recounted how her condition continued to deteriorate:

In 2022-2023, teachers were no longer allowed to keep the doors open anymore due to safety concerns. I continued to suffer with the same issues, but these issues started to get worse. The brain fog and





confusion were so bad at times that I couldn't remember the names of my students or colleagues. I had trouble finding words and would lose my thought in middle of a sentence. I would make mistakes during the day that I would not normally do. I would forget conversations and could not remember if had completed a task. I was extremely ill after returning to the classroom again. Not only was my throat closing daily at work, I was having severe stomach cramps, nausea, esophagus issues with food getting stuck in my throat, hoarse voice, lost sixteen pounds, extreme fatigue, memory issues and confusion. I had difficulty retaining information, struggled keeping up at meetings and focusing on assignments, couldn't keep up with emails or parent messages, started to have numbness in my fingers and toes, started getting strange tingling sensations in my brain and would bother me behind my right eye, moments of vertigo, depression, anxiety, and my toenails starting lifting from getting nail fungus from the carpet in the classroom. l continued to contact Dr. samples at Kaiser and he tried to reach out to other departments at Kaiser to see how to help me.

. . .

As of today, I am notable to work. I have lost the ability to do mental math and I struggle with figuring out math that used to be easy. I now get confused and lost going places when I use a GPS. I have days of extreme fatigue, I have episodes getting lost in familiar places, I cannot remember many things. I find it extremely hard to focus, I have to reread things over and over because I no longer process information like I used to. I have difficulty learning new things. I still have episodes of anaphylaxis when exposed to toxins. I had tics twice during these episodes. I am still too sick to safely monitor students and perform my job as a teacher. I cannot be reliable in another profession In the condition I am in. I live a shell of what use to be me. I am no longer the strong, healthy woman l used to be.

50.    In a report dated April 14, 2025, Neil Gupta M.D., a peer review doctor working for Defendant, analyzed Plaintiff's claim.  He insisted that there was no medical evidence supporting Plaintiff's condition or the prescribed restrictions and limitations.  He emphasized that CIRS is "not a universally accepted medical condition within evidence-based practice."  In short, he refused to acknowledge it as a real and disabling condition.  Whereas it is an admittedly rare condition, courts have not adopted the blanket denial of Dr. Gupta's position.  *See Ann C. v. Saul,*

Case No.:



2021 WL 1179272, *5, n.7 (C.D. Cal. 2021) ("Some dispute that MARCoNS and CIRS are legitimate medical diagnoses, *see, e.g.,* MARCoNS: Not a Real Diagnosis, LymeScience, https://lymescience.org/marcons/ (last visited Mar. 26, 2021), but the ALJ found CIRS as a medically determinable impairment, and Defendant has not challenged that finding or the validity of the MARCoNS test.")

51.    Dr. Farahnik addressed Dr. Gupta's position on Plaintiff's disability in a letter dated June 23, 2025.  In it, he explained that:

> At this stage, we cannot prove mold-exposure response without testing the environments that were triggering these symptoms. All we have-are Ms. Gettel's reported reactions to when she is in those environments, which she has described extensively and are consistent with symptoms that-patients have in-mold contaminated spaces and mast cell related disease.

> The patient has been suffering from symptoms consistent with Mast Cell Activation Syndrome. These labs are notoriously difficult to catch positive, particularly when undergoing treatment. The patient is responding to these treatments, especially ketotifen furmarate, as she has attempted to stop this medication and subsequently had severe mast cell symptoms re-emerge; such as consistent urticaria and rash, breathing difficulty, worsened brain fog, and so forth.

> Ms. Gettel has advised me that the insurance company has attempted to contact my office.  No such call has been received by myself or my team.  At this time, Ms. Gettel still cannot work.

52.    Furthermore, Dr. Gupta failed to adequately address Plaintiff's symptoms.  He simply claimed that Plaintiff's symptoms are inconsistent.  He relied on this to support that "the medical records do not support any condition(s) or combination of symptoms regardless of diagnosis are of a severity to cause limitations and restrictions as of 7/26/2023 and ongoing."  However, the very nature of Plaintiff's condition is that the symptoms will be inconsistent depending on her current environment.  He also failed to address that Plaintiff consistently sought extensive medical treatment and how she consistently attempted to address her

Case No.:



medical problems.  Plaintiff is not attempting to deceive anyone.  She suffers from severe medical problems.

53.     In an April 29, 2025 certification statement from Dr. Samples, he noted that Plaintiff could not work at that time due to "cognitive deficit in attention or concentration; cognitive disorder due to another medical condition."

54.     The conditions Plaintiff suffers from are very complicated and difficult to evaluate.  The fact that, when she ceased her medications, she had a significant relapse is particularly relevant.  However, there is no evidence that this updated information was ever provided to Dr. Gupta.  In fact, there is no evidence that he or any other medical professional hired by Defendant reviewed Dr. Farahnik's letter.  Given that it reports directly observable reactions to medications that support the position of Plaintiff and her treating physicians, this is particularly problematic.  Once again, Defendant has improperly cherry-picked evidence.  *See Winkler*, 170 F. App'x at 168; *Stuart*, 2010 WL 890181, at *6 & n. 3; *Black*, 2019 WL 2422481, *7.

55.     Here, Defendant failed to consider the new evidence related to Plaintiff's treatment.  Courts have been critical of insurers that fail to adequately address a treating physician's opinion.  *See Yox v. Providence Health Plan*, 659 F. App'x 941, 944 (9th Cir. Sept. 9, 2016) ("Moreover, [insurer] arbitrarily refused to address the clinical evaluation submitted by Yox's treating dentist.  When [insurer] did address the evaluation provided by another dentist, it discounted the dentist's opinion as 'insufficient' without further explanation.  [Insurer's] conclusory opinion does not satisfy its duty under ERISA.").

56.     In a July 2, 2025 statement from Dr. Samples, he noted that Plaintiff could not work at that time.  She suffered from "cognitive deficit in attention or concentration; cognitive disorder due to another medical condition; MCAS."

57.     Plaintiff responded to Dr. Gupta's report in a letter dated July 9, 2025.  Included with the letter were Dr. Farahnik's June 23, 2025 letter, various certifications from Dr. Samples supporting Plaintiff's claim, and a statement from

-18-

Case No.:



Plaintiff. In her statement, Plaintiff explained Kaiser Permanente's restrictions on Dr. Sample's statements in support of her claim. She also stated that:

> In his letter dated June 23, 2025, Joshua Farahnik, ND MPH referenced how I had recently attempted to stop taking my medications. I wanted to explain that I stopped taking the medications because I did not have the money to pay for them. I have had to borrow money in order to pay for my medicine. I am currently taking my medicine, but, even with my medication and following my doctors' instructions, my condition has not improved such that I am able to return to work.

58.    In a letter dated July 17, 2025, Defendant denied Plaintiff's appeal. It insisted that no medical evidence supported Plaintiff's claim. It cherry picked medical records to find support for its right to deny the claim. It relied completely on biased medical evaluators who only conducted paper reviews and who failed to consider some of Plaintiff's medical evidence while it completely ignored Plaintiff's doctors' accurate and reasonable medical diagnoses and opinions.

59.    Plaintiff is now and at all relevant times remained "disabled" as defined in the Plan, and has now and at all relevant times convincingly demonstrated her total disability through medical records and other documents, information and correspondence.

### **FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)
(Plaintiff against Standard and Does 1 through 10)

60.    Plaintiff incorporates the previous paragraphs as though fully set forth herein.

61.    ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan; to enforce her rights under the terms of a plan; and/or to clarify her rights to future benefits under the terms of a plan.



62.    At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan and Policy.  By denying Plaintiff's claim for LTD benefits, and by related acts and omissions, Standard violated, and continues to violate, the terms of the Policy and Plaintiff's rights thereunder.

63.    Standard has failed to follow even the most rudimentary claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Standard to make benefit determinations, no deference is warranted with regard to Standard's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

64.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. §1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.  Defendant's handling of Plaintiff's disability benefit claim falls far short of these standards.

65.    For all the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Standard abused its discretion in deciding to deny this claim as the evidence shows its denial decision was arbitrary and capricious.  Further, Standard's denial decision

-20-

Case No.:



and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008). Standard's denial of Plaintiff's claim constitutes an abuse of discretion.

66. As a direct and proximate result of Standard's denial of disability benefits, Plaintiff has been deprived of LTD benefits.

67. As a direct and proximate result of the denial of her claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action, and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

68. A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits. Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability and is therefore entitled to benefits under the Plan. In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim consistent with the terms of the Plan.

69. Plaintiff alleges all of the same conduct against Does 1 through 10 as it does against Standard in this First Cause of Action and in this Complaint.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1. For all Plan benefits due and owing Plaintiff, including LTD benefits;

2. For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g);

3. For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir.

Case No.:



2007) ("A district court may award prejudgment interest on an award of
ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*,
977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest
at the rate of 10% per annum, pursuant to California Insurance Code
Section 10111.2; and

4.    For such other and further relief as this Court deems just and proper.

Dated:  December 9, 2025                **McKENNON LAW**

                                        By: *Nicholas A. West*
                                        ROBERT J. McKENNON
                                        NICHOLAS A. WEST
                                        Attorneys for Plaintiff, NANCIE
                                        GETTEL

Case No.:



## CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on Click here to enter a date., I served the foregoing documents described as: XXXXX on the interested parties as follows:

[Insert]                                          Attorneys for [Insert]
☐ ECF Participant

☐ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.  I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business.  The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.  Executed at Newport Beach, California on Click here to enter a date..

NAME: _____

_____
(Signature)